1                                                                              **O**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A., a minor by and through his Guardian ad litem Cindy Plasencia, as successor in interest to Juan Antonio Ayon Ruiz, decedent; Maria Dolores Ruiz Vasquez, and Jose Juan Ayon Romero, parents of decedent,<br><br>                 Plaintiffs,<br><br>     v.<br><br>County Of San Bernardino, Deputy Ed Fakhoury, an individual; Deputy Brandon Becker, an individual and; DOES 3-10, inclusive,<br><br>                 Defendants. | Case No.:  5:20-cv-02468-MEMF-KK<br><br>**ORDER DENYING REQUEST FOR JUDICIAL NOTICE AND GRANTING IN PART MOTION FOR SUMMARY JUDGMENT [ECF NOS. 85, 80]** |

       Before the Court is a Request for Judicial Notice (ECF No. 85) and Motion for Summary Judgment (ECF No. 80) filed by Defendants, County of San Bernardino, Deputy Brandon Becker, and Deputy Ed Fakhoury. For the reasons stated herein, the Court DENIES the Request for Judicial Notice and GRANTS IN PART the Motion for Summary Judgment.

/ / /

/ / /

### I.  Factual Background

This action stems from a police shooting of Juan Antonio Ayon Ruiz ("Ruiz") on January 10, 2020. On the evening of January 10, Ruiz picked up his two-year-old son, J.A., from J.A.'s grandmother's house. As Ruiz drove J.A., two San Bernardino County Sherriff's Deputies, Eid Fakhoury ("Fakhoury") and Charles Becker ("Becker"), attempted a traffic stop of Ruiz. Ruiz did not pull over and a pursuit ensued. When the pursuit ended, Fakhoury and Becker parked behind Ruiz's car on the side of the road. As Fakhoury and Becker exited their car, Ruiz put his car in reverse and accelerated towards Fakhoury and Becker's vehicle, allegedly ramming it and knocking them down. Fakhoury and Becker then fired repeatedly at Ruiz's car, killing Ruiz. J.A. was not physically harmed.

### II.  Procedural History

J.A., through his mother and Guardian ad Litem Cindy Plasencia, and Ruiz's mother, Maria Dolores Ruiz Vasquez ("Vasquez," or collectively with J.A., "Plaintiffs") filed suit in this Court on November 24, 2020. ECF No. 1. On March 26, 2021, the Court granted in part Defendants' motion to dismiss and granted Plaintiffs leave to amend. ECF No. 29. Plaintiffs filed a First Amended Complaint on April 9, 2021. ECF No. 30 ("FAC"). On May 20, 2021, the Court granted in part Defendants' second motion to dismiss and again granted Plaintiffs leave to amend. ECF No. 39. Plaintiffs had moved to dismiss Vasquez's claims for lack of standing. *See* ECF No. 31. The Court denied this request and held that Vasquez had standing and could pursue claims for deprivation of life without due process (second cause of action in the FAC) and for interference with parent-child relationship (third cause of action in the FAC). *See* ECF No. 39 at 6–8. The Court dismissed Plaintiffs' *Monell* claim[1] (fourth cause of action in the FAC) with prejudice. ECF No. 39 at 8–13.

Plaintiffs filed a Second Amended Complaint on August 3, 2021. ECF No. 45 ("SAC"). Plaintiffs bring seven causes of action against Fakhoury, Becker, and the County of San Bernardino (the "County"): (1) a 42 U.S.C. § 1983 ("Section 1983") claim by J.A. only for unreasonable search

---

[1] The Court held that Vasquez had standing to pursue this claim, but nevertheless dismissed the claim with prejudice as to Vasquez and J.A. for failure to state a claim upon which relief could be granted. *See* ECF No. 39 at 6–8, 8–13.

and seizure (excessive force) against Fakhoury and Becker (*see* SAC ¶¶ 32–42); (2) a Section 1983 claim by J.A. and Vasquez for deprivation of life without due process against Fakhoury and Becker (*see* SAC ¶¶ 43–54); (3) a Section 1983 claim by J.A. and Vasquez for interference with parent-child relationship against Fakhoury and Becker (*see* SAC ¶¶ 55–63); (4) a claim for wrongful death by J.A. only pursuant to California Civil Procedure Code § 377.60 against Fakhoury, Becker, and the County (*see* SAC ¶¶ 64–70); (5) a claim for assault and battery by J.A. only against Fakhoury, Becker, and the County (*see* SAC ¶¶ 71–77); (6) a claim for negligence by J.A. only against Fakhoury, Becker, and the County (*see* SAC ¶¶ 78–84); and (7) a claim for violations of California Civil Code § 52.1 (the "Bane Act") by J.A. only against Fakhoury, Becker, and the County (*see* SAC ¶¶ 85–92). Plaintiffs seek general damages, special damages, punitive damages against Fakhoury and Becker, attorneys' fees, and other relief the Court may deem proper. *See* SAC at Prayer for Relief.

Defendants filed a Motion for Summary Judgment on February 24, 2023. ECF No. 80 ("Motion" or "Mot."). In accordance with the requirements in the Court's Standing Order, the Motion was briefed and filed jointly by Defendants and Plaintiffs. Also on February 24, 2023, Defendants filed a Joint Appendix of Undisputed and Disputed Uncontroverted Facts (ECF No. 81, "DSUF"), several declarations with exhibits (ECF No. 82, "Delhauer Declaration" or "Delhauer Decl.;" ECF No. 83, "Meyer Declaration" or "Meyer Decl.;" ECF No. 84, "Flores-Oster Declaration" or "Flores-Oster Decl."), a Request for Judicial Notice[2] (ECF No. 85, "RJN"), a Notice of Manual Filing of a Thumb Drive[3] (ECF No. 86), an Evidentiary Appendix (ECF No. 87), and a set of Objections to the expert declaration submitted by Plaintiffs (ECF No. 88). Also on February

---

[2] Defendants request that the Court take judicial notice of the existence of prior orders in this action and prior versions of the complaint. *See* RJN. Although the Court can generally take judicial notice of the existence of court records, which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," *see* Fed. R. Evid. 201(b), it appears to the Court that it is wholly unnecessary to do so here. Defendants do not cite to the documents, the prior versions of the complaint are no longer operative, and the orders are already law of the case. Defendants' Request for Judicial Notice (ECF No. 85) is DENIED as MOOT.

[3] ECF No. 86 indicates that Defendants lodged a USB with three audio recording and transcripts of all three audio recordings. *See* ECF No. 86. The USB the Court received contained only audio recordings and no transcripts. This is of no moment, as the audio recordings speak for themselves.

24, 2023, Plaintiffs filed a Statement of Uncontroverted Facts and Genuine Disputes (ECF No. 89, "PSUF") and three declarations with exhibits (ECF No. 90, "First Defoe Declaration" or "Defoe Decl. 1;" ECF No. 91[4], "Second Defoe Declaration" or "Defoe Decl. 2;" ECF No. 92 "Navab Declaration" or Navab Decl.").

### III.   **Applicable Law**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a

---

[4] The Defoe Declaration and Second Defoe Declaration, and the exhibits submitted with each, are identical. *See* Defoe Declaration, Second Defoe Declaration.

genuine dispute of material fact for trial. *Anderson*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at 322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. *Id.* 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.  To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

/ / /

/ / /

/ / /

IV.     **Findings of Fact**[5]

    A.  Ruiz picked up J.A.

    J.A. is Ruiz's son. PSUF ¶ 342. As of January 2020, J.A. was approximately two and a half years old. PSUF ¶ 154.

    On January 10, 2020, J.A. was the house of Lilia Arechiga[6] ("Arechiga"), J.A.'s maternal grandmother. PSUF ¶ 152. Arechiga often babysat J.A., and Ruiz would often pick up J.A. around 9:00 pm. *See id.* ¶¶ 156, 158. Ruiz came to Arechiga's house at approximately 9:00 p.m. on January 10, 2020, to pick up J.A. *Id.* Ruiz mentioned that he was tired but did not seem agitated or in any way intoxicated to Arechiga. *Id.* ¶ 161. Ruiz stayed at Arechiga's house for five minutes before leaving with J.A. *Id.* ¶ 160. Although there was a car seat for J.A. at Arechiga's house, which Ruiz typically took when he picked up J.A., Ruiz did not take the car seat with him that day. *Id.* ¶¶ 159, 160.

    Ruiz drove a 2005 Buick Rainer, which he owned and which was registered to him. *Id.* ¶ 153. Ruiz left with J.A. in the Buick Rainer. *See id.* ¶ 160. The Buick Rainer had dark tint on all windows. *See id.* ¶ 230.

    B.  Deputies Fakhoury and Becker.

    Fakhoury and Becker are Sheriff's Deputies for the San Bernardino County Sheriff's Department ("SBCSD"), and received training on the use of force, traffic stops, and other topics

---

[5] The facts set forth below are taken from the Defendants Appendix of Undisputed and Disputed Uncontroverted Facts and Plaintiffs' Statement of Undisputed Facts. ECF Nos. 81, 89. To the extent that any statements of fact are omitted, the Court concludes they are not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

In making these Findings of Fact, the Court considered Defendants' Evidentiary Objections. ECF No. 88. The Court did not find any evidence that Defendants objected to essential to finding any fact stated herein, except where explicitly stated otherwise. The Court need not reach any objection except those addressed in this Order.

Pursuant to Rule 56(g), the Court finds that these facts are "established in the case." See Fed. R. Civ. P. 56(g).

[6] Plaintiffs' SUF uses the spelling "Archiga." *See, e.g.*, SUF ¶ 156. The underlying documents cited documents consistently use "Arechiga." *See, e.g.*, Navab Decl. ¶ 12 (describing "Deposition Transcript of Lilia Arechiga"); ECF No. 92 at 91 (Deposition Transcript of "LILIA ARECHIGA"). The Court will use Arechiga.

1    from the SBCSD. DSUF ¶¶ 135, 141, 147, 149. Neither deputy has been involved in any use of

2    deadly force shootings other than that of Ruiz. DSUF ¶¶ 145, 151.

3          On January 10, 2020, Fakhoury and Becker were scheduled to work from 7:00 p.m. to 7:00

4    a.m. DSUF ¶ 1. Their assignment was to patrol an area that included Muscoy, California. *Id.* At

5    approximately 9:00 p.m. they began to patrol around Muscoy. Fakhoury considered Muscoy to be, in

6    his experience, an area with a high crime rate. *Id.*

7          C. The Deputies' Account of the Pursuit.

8          Fakhoury first saw Ruiz's car while Fakhoury and Becker were driving northbound on Macy

9    Street and Ruiz was driving southbound on Macy Street. *Id.* ¶ 6. Fakhoury testified[7] that he noticed

10   Ruiz's car did not have a front license plate and had tinted windows, and, upon looking in his mirror,

11   noticed that Ruiz's car had a broken taillight. *See id.*; *see also* ECF No. 92-1 at 16 (Fakhoury Tr.

12   73:03–10). Fakhoury then told Becker that he would attempt a traffic stop on Ruiz's car. DSUF ¶ 6;

13   PSUF ¶ 169. Becker testified that Becker recalls Fakhoury mentioning that Fakhoury noticed the

14   lack of a front license plate but testified that Becker did not recall Fakhoury mentioning the tinted

15   windows or broken taillight. *See* AUF ¶ 6; ECF No. 92-1 at 88–89 (Becker Tr. 72:03–73:05). Becker

16   had not noticed Ruiz's Buick at all or noticed the lack of a front license plate or the other issues

17   Fakhoury saw, but Becker agreed that they should perform a stop. PSUF ¶ 171; ECF No. 92-1 at 94

18   (Becker Tr. 73:06–08). Fakhoury and Becker made a U-turn and pursued Ruiz. DSUF ¶ 8.

19         Initially, Fakhoury and Becker did not turn on their overhead lights or sirens. DSUF ¶ 10.

20   Fakhoury and Becker testified that they observed Ruiz turn right. *See id.* Although their lights and

21   sirens were not on, Fakhoury testified that he concluded that Ruiz was evading them. *See id.*; ECF

22

23   _____

24   [7] Where the Court describes what Fakhoury and/or Becker testified to, the Court's finding is only that
     Fakhoury and/or Becker gave this testimony, not that underlying facts testified to are true. In a police
     shooting case, the Court "may not simply accept what may be a self-serving account by the police officer."
25   *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). "Deadly force cases pose a particularly difficult
     problem under [the standards governing summary judgment] because the officer defendant is often the only
26   surviving eyewitness." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). "Therefore, the judge must ensure
     that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the
27   person shot dead—is unable to testify." *Id.* The Court "must also look at the circumstantial evidence that, if
     believed, would tend to discredit the police officer's story, and consider whether this evidence could convince
28   a rational factfinder that the officer acted unreasonably." *Id.*

No. 92-1 at 22–23 (Fakhoury Tr. 86:19–87:16). Becker testified that he observed Ruiz traveling over 80 miles per hour before Becker and Fakhoury turned on their lights. DSUF ¶ 11. Ruiz drove into a shopping center parking lot and quickly exited it back onto a public road, with Fakhoury and Becker following. PSUF ¶ 181.

Fakhoury and Becker initiated their lights and sirens.[8] DSUF ¶ 10. ECF No. 92-1 at 23 (Fakhoury Tr. 87:13–16). Ruiz did not stop his vehicle once the lights and sirens were turned on. DSUF ¶ 12. Becker communicated with police dispatch and requested assistance from sheriff's aviation. PSUF ¶ 187. Fakhoury testified that Ruiz drove over 80 miles per hour, with Fakhoury and Becker in pursuit. DSUF ¶¶ 13, 15. Fakhoury and Becker drove on the wrong side of the road in pursuit. PSUF ¶ 189. Becker testified that Fakhoury and Becker only crossed to the wrong side of the road when "safe to do so." *Id.*; ECF No. 92-1 at 108 (Becker Tr. 105:07–12). Ruiz also crossed to the wrong side of the road during the pursuit. DSUF ¶ 17. Ruiz ran a red light and several stop signs. DSUF ¶ 18.

Fakhoury and Becker noticed that Ruiz had a temporary license plate and attempted to call in the plate number. DSUF ¶ 190. Ruiz had recently purchased the Buick on October 11, 2019. DSUF ¶ 191. Fakhoury and Becker had no information suggesting that the car was stolen. DSUF ¶ 193.

Fakhoury and Becker could not see inside the vehicle during the pursuit and did not know how many people were in it. DSUF ¶ 193.

Fakhoury believed that Ruiz might be heading towards "the Wash," a flood basin where suspects fleeing police sometimes go in attempts to escape pursuit. DSUF ¶ 205; ECF No. 92-1 at 109–110 (Becker Tr. 111:19–112:17). If Ruiz had entered the wash, air support could have aided in the pursuit. DSUF ¶ 205; ECF No. 92-1 at 111 (Becker Tr. 113:02–16).

### D. The Undisputed Facts Regarding the Pursuit.

The pursuit continued for six to seven minutes. DSUF ¶ 19; PSUF ¶ 196. During the pursuit, Becker made radio transmissions describing the vehicle's speed and the infractions Ruiz was

---

[8] Fakhoury testified that they turned on their lights and sirens before entering the shopping center parking lot, while Becker testified that they turned on their lights and sirens after exiting the parking lot. DSUF ¶¶ 183, 184.

committing. PSUF ¶ 205. Fakhoury and Becker were aware that backup units were en route, including both other police cars and air support. PSUF ¶ 204.

At 9:34 pm., Ruiz called Citaly Plasencia, and told her he was being followed by police. PSUF ¶ 160. Citaly Plasencia is J.A.'s aunt. *See id.* ¶ 156. The call ended before the pursuit came to its end. *See* PSUF ¶ 160.

The pursuit ended with Ruiz veering to the right and appearing to collide with some mailboxes. DSUF ¶ 20. Fakhoury could hear other sirens approaching. PSUF ¶ 223. Another sheriff's deputy, Lopez, was only 50 yards behind Fakhoury and Becker, and Becker had seen Lopez earlier during the pursuit. *Id.*

Fakhoury and Becker parked behind Ruiz's Buick. PSUF ¶ 224. They were approximately four to ten feet behind the Buick. DSUF ¶ 21; ECF No. 92-1 at 39 (Fakhoury Tr. 118:21–25); ECF No. 92-3 at 23 (Delhauer Tr. 84:18–23).

E.   The Deputies' Account of the Shooting.

Fakhoury stepped out his car and stood behind the car's open door, in the A frame of the door. DSUF ¶ 21. Fakhoury drew his gun. DSUF ¶ 26. Becker exited on the other side of their car, keeping one foot in the car. PSUF ¶ 225. Becker drew his gun and pointed it towards Ruiz, through the back window of Ruiz's Buick. *Id.* Fakhoury and Becker could not see inside the Buick. DSUF ¶ 23.

Fakhoury pointed his gun towards the Buick and said, "Let me see your f***ing hands." DSUF ¶ 29. Fakhoury was not aware of whether Ruiz heard this command. PSUF ¶ 230; ECF No. 92-1 at 47 (Fakhoury Tr. 128:16–19).

Ruiz's then moved backwards towards Fakhoury and Becker's car.[9] DSUF ¶ 30. Fakhoury and Becker each testified that Ruiz hit the police car and caused both Fakhoury and Becker to

---

[9] Based on a review of the DSUF, PSUF, and the objections to each, the Court understands that this fact—that Ruiz's car at least briefly moved backwards towards Fakhoury and Becker's car—is not in dispute. Plaintiffs dispute whether there was a collision (noting that Lopez did not witness one and there is little to no evidence of damage) and note that "Mr. Ruiz's gear shift was not in the reverse gear after the shooting," but do not dispute that Ruiz put the vehicle in reverse and accelerated backwards. *See* Objections to DSUF ¶ 30. At the hearing, Plaintiffs confirmed that they do not dispute that the car moved backwards, but suggested a possibility that it may have done so without being in reverse gear.

1  stumble. PSUF ¶ 231. Fakhoury testified that he believed there was an imminent threat when he

2  purportedly saw Ruiz's reverse lights turned on. DSUF ¶ 50. Becker testified that he believed that he

3  and Fakhoury would be run over or killed by Ruiz's car or their own car being pushed by Ruiz's car.

4  DSUF ¶ 41.

5      Fakhoury and Becker then fired their guns at Ruiz's Buick. DSUF ¶ 34. Fakhoury testified

6  that as he was shooting, Ruiz continued accelerating backwards into the police car, and the "tires

7  were kicking up dirt." DSUF ¶ 45; ECF No. 92-1 at 60–61 (Fakhoury Tr. 144:25–145:11). Fakhoury

8  testified that the police car was pushed one to two feet backwards from the impact with Ruiz's Buick

9  and Ruiz continued acceleration during the shooting. DSUF ¶ 35. The police car was in park and

10 remained in park. PSUF ¶ 271.

11     Fakhoury and Becker began shooting at approximately the same time. PSUF ¶ 277. Fakhoury

12 recalls firing five to seven shots in rapid succession, without pausing between the shots. PSUF ¶ 280.

13 ECF No. 92-1 at 52–53 (Fakhoury Tr. 134:20–135:01). Becker fired fourteen shots in rapid

14 succession, also without pausing between the shots. PSUF ¶ 281; ECF No. 29-1 at 128–129 (Becker

15 Tr. 134:20–135:06). Becker stopped shooting when he ran out of ammunition, at which point he

16 reloaded and reassessed the situation. PSUF ¶ 281; ECF No. 29-1 at 129 (Becker Tr. 135:09–15).

17     Fakhoury and Becker each testified that as Ruiz's Buick moved backwards towards their car,

18 they believed they could be injured or killed if they moved from the cover of their police car. DSUF

19 ¶ 47. Fakhoury remained in the A-frame of the door as he fired at Ruiz. PSUF ¶ 241. Becker

20 remained in the A-frame of the other door, and Fakhoury was aware of Becker's position. *Id.* ¶ 273.

21 The A-frame of a police car door is generally considered the safest place for a deputy to be during a

22 traffic stop. PSUF ¶ 269.

23     When Fakhoury and Becker stopped shooting, Ruiz was slumped over in the driver's seat.

24 PSUF ¶ 281. Ruiz perished as a result of the shooting. DSUF ¶ 62.

25     F. Deputy Lopez's Account of the Shooting.

26     Lopez—the previously mentioned deputy who was close behind Fakhoury and Becker—

27 arrived at the scene as the shooting occurred. PSUF ¶ 236; ECF No. 92-2 at 14–15 (Lopez Tr.

28 53:02–54:01). He had been driving 60 to 80 miles per hour and stopped abruptly next to Ruiz's

1    Buick. PSUF ¶¶ 235, 236. Lopez did not see white reverse lights activate on the Buick, did not see

2    the Buick moving backwards, did not see the Buick hit Fakhoury and Becker's car, did not see

3    Fakhoury and Becker's car move backwards, did not see the tires spinning, and did not see Becker or

4    Fakhoury fall backwards. PSUF ¶¶ 242–246; ECF No. 92-2 at 17–19 (Lopez Tr. 56:19–58:02).

5    Lopez did not consider using deadly force and did not perceive any threat to himself when he

6    arrived. PSUF ¶ 247; ECF No. 92-2 at 19 (Lopez Tr. 58:18–23). By the time Lopez exiting his

7    vehicle, the shooting had ended. DSUF ¶ 56.

8         G.   Other evidence regarding the alleged collision and the shooting.

9         Audio recordings of the incident reveal that approximately two second after Fakhoury said

10   "Let me see your f***ing hands," Fakhoury said "Oh my," and approximately two second after that,

11   Fakhoury said "I'ma [sic.] shoot him." *See* Ex. A-1 to ECF No. 86 (Fakhoury Belt Recording) at

12   5:40–6:00; *see also* Ex. B-1 to ECF No. 86 (Becker Belt Recording) at 5:48–5:56. Approximately

13   two second after that, Becker said, "Rammed our vehicle." Ex. B-1 to ECF No. 86 (Becker Belt

14   Recording) at 5:52–6:00. Immediately after that, the deputies began shooting. *See id.*

15        Defendants' expert, Delhauer, testified there is no way to tell from the evidence whether the

16   Buick made contact with Fakhoury and Becker's car. PSUF ¶ 250. The on-scene police investigator,

17   Garrison, also was unable to confirm from the evidence whether a collision occurred. PSUF ¶ 259.

18   There was chipped paint on the Buick's tow hitch, which could have come from a collision with the

19   police car or could have been pre-existing from everyday use of the car. PSUF ¶¶ 254–56. The Buick

20   had a cracked rear taillight, which similarly could have come from the accident or could have been

21   pre-exiting. PSUF ¶¶ 257, 258. Pictures from the accident scene show the cars very close together,

22   with a possible gap (of an inch or two at most) between the two cars' bumpers, and no clear view of

23   the tow hitch. PSUF ¶ 252; ECF No. 92-3 at 54–66. The photos do not show any visible damage to

24   either car from a collision. PSUF ¶ 253; ECF No. 92-3 at 54–66. Defendants did not document any

25   damage to the police car, and the crime scene report does not note any damage. PSUF ¶¶ 261, 262.

26   No airbags deployed in either car. PSUF ¶ 265. The Buick contained a module that was supposed to

27   record any collision at more than five miles per hour, and the module recorded no data suggesting a

28   collision. PSUF ¶ 266.

H.   The Aftermath of the Shooting.

After Fakhoury and Becker had stopped shooting, Fakhoury and Becker noticed J.A. in the second row of the Buick. *Id.* ¶ 285. Fakhoury instructed J.A. to get out of the vehicle, and Becker continued pointing his gun at the vehicle. *Id.* ¶ 287. Fakhoury continued pointing his gun towards the driver's seat, believing that Ruiz might still be a threat. *Id.* ¶¶ 288, 290. Lopez also continued pointing his gun at the vehicle. *Id.* ¶ 292.

J.A. appeared two to five years old to Becker. *Id.* ¶ 289. Fakhoury attempted to get J.A. to exit the vehicle, and, at one point, asked J.A. whether Ruiz was moving.[10] Ex. A-1 to ECF No. 86 (Fakhoury Belt Recording) at 7:10-7:30. J.A. was removed from the car approximately seven to eight minutes after the shooting. DSUF ¶ 59.

Becker requested medical responders via radio approximately fifteen seconds after the shooting. DSUF ¶ 61; Ex. B-1 to ECF No. 86 (Becker Belt Recording) at 6:00–6:30. A medic arrived at approximately 9:45 p.m. and pronounced Ruiz deceased at 9:49 p.m. DSUF ¶ 62.

Citaly Plasencia was informed by a Sheriff's deputy that J.A. was in the vehicle, and she came to the scene. *Id.* ¶ 302. Cindy Plasencia, J.A.'s mother, also came to the scene after being told by Citaly Plasencia. *Id.* ¶¶ 303, 304. Cindy Plasencia asked if she could see J.A. but was told by the Sheriff's deputies she could not, even after explaining that she was the J.A.'s mother. *Id.* ¶ 305. J.A. left in an ambulance.[11] J.A. was not physically injured in the shooting, but was transported to a hospital as a precaution. DSUF ¶ 60.

No weapon or gun was found in Ruiz's car. PSUF ¶ 268.

I. Autopsy of Ruiz.

---

[10] Although the parties' submissions indicate that Fakhoury asked J.A. to "check" whether Ruiz was "breathing," PSUF ¶ 293, the Court's review of the audio indicates that Fakhoury merely says "Is your dad moving, or no?" At the hearing, J.A.'s counsel confirmed that the Court's understanding of the recording is correct.

[11] Plaintiffs submitted as an undisputed fact that Cindy Plasencia was threatened with arrest when she asked if she could remove her son, J.A., from the ambulance. PSUF ¶ 306. The deposition transcript Plaintiffs submitted does not contain the pages cited in support of this fact. *See* ECF No. 92-1 at 147–151 (excerpt of Cindy Plasencia Tr.).

The Riverside County Coroner's Office performed an autopsy on Ruiz on January 14, 2020. DSUF ¶ 63. A sample of Ruiz's blood was tested and found to be positive for: alcohol (0.053%), methamphetamine (0.030 mg/L), delta 9 THC (marijuana, THC) (0.0046 mg/L and 0.026 mgL), and a metabolite of cocaine (0.020 mg/L). DSUF ¶ 65. A sample of Ruiz's urine was tested and found to positive for: alcohol (0.081 g%), cocaine (0.012 mg/L, 3.890 mg/L, and less than .005 mg/L), methamphetamine (1.610 mg/L and 0.273 mg/L), and THC (0.371 mg/L). DSUF ¶ 66. A sample of Ruiz's vitreous humor of the eye was tested and found to be positive for: alcohol (0.059% W/V); Methamphetamine (0.166 mg/L); Cocaine (0.036 mg/L); Benzoylecgonine (0.081 mg/L); and Cocaethylene (0.006 mg/L). DSUF ¶ 67.

J.   Policies and Expert Opinions on the Policies.

SBCSD's Policies (the "Policies") advise that deputies should not shoot at a moving vehicle. PSUF ¶ 275. Under the Policies, a deputy should have an identifiable target before shooting. *Id.* ¶ 283; ECF No. 29-1 at 83 (Becker Tr. 49:16–23). Fakhoury and Becker could not see into the car when they began shooting and were not aware if there were passengers in the car. *Id.* ¶ 284.

The SBCDC found that none of Fakhoury or Becker's actions had violated the Policies. *Id.* ¶ 309. Neither Fakhoury nor Becker were disciplined for the shooting of Ruiz. DSUF ¶¶ 146, 152.

Defoe, Plaintiffs' expert, opined that they violated the Policies in several ways, and that Fakhoury or Becker could have safely handled the situation if they had acted differently.[12] *Id.* ¶¶ 310–330. Delhauer also opined that the pursuit of Ruiz was appropriate in the circumstances. DSUF ¶ 98. Meyer, Defendants' expert, opined that if Fakhoury's and Becker's testimony is believed, the use of force was appropriate under the totality of the circumstances. DSUF ¶¶ 68–89.

K.   Ruiz's Mother's Ties to the United States.

---

[12] Defendants object to much of Dafoe's testimony. *See* ECF No. 88. Defendants' objections are, in summary, that Dafoe should not opine on the ultimate question of whether the use of force was reasonable, and that the standard of reasonableness is not guided by police department policies. *See id.* The Court need not reach this issue at this stage but will consider Defendants' argument if a motion to exclude Defoe's testimony is filed in advance of trial. At this stage, the Court finds that the portions of Defoe's testimony summarized in the statement above do not constitute an opinion on the ultimate question.

Vasquez is Ruiz's mother, and Ruiz was her eldest son. *Id.* ¶¶ 331, 353. Vasquez moved from Mexico to the United States in 1989. *Id.* She resided in the United States from 1989 until October 2019, when she left to Mexico for her mother's funeral. *Id.* ¶¶ 332, 333; DSUF ¶ 124. Vasquez currently resides in Tijuana, Mexico. DSUF ¶ 108. Vasquez testified that she intends to return to the United States but does not have a date certain for this return. PSUF ¶ 358. She is a citizen of Mexico, and not a citizen of the United States. DSUF ¶¶ 115, 116. She has a Mexican passport and does not have an American passport. DSUF ¶¶ 120, 121. She has never owned property, registered to vote, or had a driver's license in the United States. DSUF ¶¶ 117–119. She does not currently have a green card issued by the United States. DSUF ¶ 122.

Vasquez married Ruiz's father, Jose Juan Ayon Romero ("Romero") in Sacramento, California in 2005. PSUF ¶ 335. Romero paid income tax in the United States. *Id.* ¶ 357. Vasquez and Romero have been separated for six years. DSUF ¶ 130. Vasquez worked at a restaurant in Rancho Cucamonga, California from 2009 until 2019. PSUF ¶ 337.

L. The Relationship Between Ruiz and the Plaintiffs.

Vasquez lived in a house with Ruiz from 2005 until 2019. *Id.* ¶ 338. Vasquez and Ruiz vacationed together when he was a child. *Id.* ¶ 339. Vasquez was with Ruiz at J.A.'s birth. *Id.* ¶ 352. Vasquez babysat J.A. at times before she left for Mexico. *Id.* ¶ 340. Vasquez had a good relationship with Ruiz. *Id.* ¶ 353. Vasquez last saw Ruiz in person in October 2019. *Id.* ¶ 344. Vasquez spoke to Ruiz on the afternoon of his death, and he stated that he would send her money. *Id.* ¶ 343.

Ruiz was a good father to J.A., was involved in J.A.'s life, and spent significant time with J.A. *Id.* ¶ 342. Ruiz lived with Romero, Cindy Plasencia, and J.A. at the time of Ruiz's death. *Id.* ¶¶ 362, 363. Romero paid in part for Ruiz's funeral. *Id.* ¶ 366.

**V.   Discussion**

A. Summary judgment is denied as to the first cause of action.

J.A.'s first cause of action is a Section 1983 claim for "unreasonable search and seizure—excessive force." *See* SAC ¶¶ 32–42. Defendants seek summary judgment on this claim. *See* Mot. at 5–13. For the reasons stated below, the Court finds that there are disputed issues of material fact on this claim that preclude summary judgment.

14

> i. *Whether or not Defendants had probable cause to pull Ruiz over is not relevant to the
> first cause of action.*

Defendants first argue that the undisputed facts show that Fakhoury and Becker were justified in pulling over Ruiz and attempting to arrest him. *See* Mot. at 5–6. Plaintiffs dispute this and argue that Fakhoury and Becker lacked probable cause for their initial decision to pursue Ruiz. *See* Mot. at 13.

J.A.'s first cause of action alleges that Fakhoury and Becker engaged in an "unjustified shooting and use of deadly force that was both excessive and unreasonable under the circumstances." SAC ¶ 34. Although the parties briefed the issue of probable cause as discussed above, and Plaintiffs argue that the initial stop lacked probable cause, this cause of action concerns only excessive force and not the initial stop. *See id.* The Court finds that the reasonableness of the initial stop is not relevant to the first cause of action but is relevant to the state law claims as discussed below.

> ii. *There are disputed issues of fact as to whether the force used was reasonable.*

Excessive force claims are evaluated using an objective reasonableness standard, where the finder of fact must decide whether "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "proper application" of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"Ultimately, the 'most important' *Graham* factor is whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). If the suspect poses such a threat, the officer may use deadly force to apprehend the suspect. *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991). If a suspect does not pose a threat, the use of

deadly force to stop the suspect from escaping is constitutionally unreasonable. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "A desire to resolve quickly a potentially dangerous situation," standing alone, "is not sufficient to justify a use of deadly force." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

"The question of the reasonableness of the force used in an arrest is usually for the jury." However, the trial court "must decide this issue on summary judgment where qualified immunity is at issue." *White by White v. Pierce Cnty.*, 797 F.2d 812, 816 (9th Cir. 1986). In deciding a motion for summary judgment, the Court must draw all inferences that the undisputed facts allow in favor of the non-moving party. *See Diebold*, 369 U.S. at 655. Accordingly, in order to win summary judgment on the issue of qualified immunity (and any other issue), Defendants must show that even viewing the undisputed facts in the light most favorable to Plaintiffs, Defendants are entitled to qualified immunity as a matter of law.

Here, Fakhoury and Becker each testified that they feared for their safety as Ruiz reversed into their vehicle, immediately before firing their weapons. DSUF ¶¶ 40, 41. But a "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Mattos v. Agarano*, 661 F.3d at 441–42. Based on the undisputed facts in the record, a jury could find that a reasonable officer would not have viewed Ruiz as an immediate threat sufficient for the use of deadly force.

There is a dispute of fact as to whether the Buick hit the police car at all, and if so, how hard the Buick hit the police car, whether Ruiz continued accelerating into the police car after initial impact, and whether Ruiz was still accelerating towards the police car when Fakhoury and Becker began shooting. Fakhoury and Becker testified that all of this occurred, and that the impact from the collision knocked them over and made them fear for their safety. DSUF ¶¶ 37–48. But, viewing the facts in the light most favorable to Plaintiffs as required, other evidence could lead a jury to find the Deputies' testimony not credible and find that Ruiz did not crash into the police car, or that he did not hit the police car at any significant speed, and that he did not continue accelerating after hitting the car. There was no obvious damage to either vehicle suggesting a significant crash. PSUF ¶ 253; ECF No. 92-3 at 54–66. No airbags deployed, and the Buick's module did not record an impact.

PSUF ¶¶ 265, 266. A jury could also find that Ruiz accelerated towards the car, but had stopped and was no longer a threat when Fakhoury and Becker began shooting. Lopez, who arrived during the shooting, did not see anything that would support Fakhoury and Becker's testimony on these issues. *See* PSUF ¶¶ 242–246. Among other things, Lopez did not see Ruiz's tires spinning during the shooting, while Fakhoury testified that the tires were spinning and kicking up dirt during the shooting. PSUF ¶ 244; ECF No. 92-1 at 60–61 (Fakhoury Tr. 144:25–145:11). Lopez also did not see either Fakhoury or Becker fall. PSUF ¶¶ 241; 241. The on-scene investigator could not confirm from the evidence whether a collision occurred, nor could Defendants' expert witness. PSUF ¶¶ 250, 259. All of this could lead the jury to disbelieve Fakhoury and Becker and find that the vehicles did not collide, or that if they collided, the collision was not as significant as Fakhoury and Becker claimed. Such a finding could lead the jury to find that Fakhoury and Becker were objectively not in any danger of being hit by the car. One possible finding is that Ruiz accelerated backwards briefly, then stopped accelerating, and that Fakhoury and Becker began firing after he had stopped accelerating, when it was clear that he was not a threat.

Other facts could also support a finding that Fakhoury and Becker were not in danger of being hit by the car when they began shooting. Even taking Fakhoury and Becker's testimony as true, Ruiz hit their car, kept pushing against it, and only caused it to move one or two feet. DSUF ¶ 35. The police car was in park and remained in park. PSUF ¶ 271. Drawing all inferences in favor of J.A., it is far from clear that such an incident could lead to either officer being run over. Further, it is worth noting that each deputy was to the side of the car, not directly in the path of Ruiz's car. *See* DSUF ¶ 21; PSUF ¶ 225. A jury could find that if the car were pushed straight backwards, it would be very unlikely to hit them. And if Ruiz had swerved around the car towards Fakhoury and Becker (which might not even be possible given the angle), they were protected by the A-frame of their doors, considered the safest place to be, and ready to fire if necessary. *See* PSUF ¶¶ 241, 269, 273. And as discussed above, a jury could also find Fakhoury and Becker's testimony not credible.

The other *Graham* factors should also be considered but are ultimately not dispositive. *See Graham*, 490 U.S. at 396. The severity of the crime at issue—various alleged violations of the vehicular code followed by an attempt to evade arrest—is not sufficient to justify a fatal shooting if

the deputies did not face an immediate threat. The fact that Ruiz sought to evade arrest by flight

weighs slightly towards justification for the force used, but similarly is not sufficient if there was not

an immediate threat. Whether the officer faced a threat is "the most important *Graham* factor," and

because the jury could find the officers did not face such a threat, the jury could find that the force

used was not justified. *See Mattos*, 661 F.3d at 441.

Despite Defendants' argument otherwise (*see* Mot. at 54), the evidence discussed above that

could support a finding of liability is more than a "scintilla." *See Anderson*, 477 U.S. at 252. On the

factual record before the Court, the Court holds that a reasonable jury could find that Fakhoury and

Becker did not have an objectively reasonable fear of danger that would justify the use of deadly

force.

Defendants point to many other facts that could support a finding of a reasonable fear that

justified that shooting. To be clear, the Court's holding here is not that the only possible finding

from a reasonable juror would be that the use of force was unjustified. A jury could find the use of

force justified on these facts. But Defendants are not entitled to summary judgment, and a jury must

decide whether Fakhoury's and Becker's actions were justified.

Defendants' other arguments and citations to other case law are unavailing.[13] First,

Defendants point to *Sykes v. United States*,[14] where the Court held that when a suspect flees police in

a vehicle, "a lack of concern for the safety of others [is] an inherent part of the offense." *Sykes v.*

*United States*, 564 U.S. 1, 8 (2011). Defendants argue that Ruiz's flight shows he had a "willful

disregard for the lives of others," and that "decisional authority permits officers to use deadly force

when necessary to protect the public." Mot. at 8–9. Plaintiffs argue that to justify the use of deadly

_____

[13] Defendants argued that the testimony of purportedly unavailable witness "Maria" should not be considered.
*See* Mot. at 12. The Court need not reach this issue, having found other evidence sufficient to create a triable
issue of fact.

[14] Plaintiffs argue that *Sykes* was "overturned in its entirety" by *Johnson v. United States*, 576 U.S. 591
(2015). *See* Mot. at 16. Having reviewed both *Sykes* and *Johnson*, the Court finds that the portions of *Sykes*
cited by Defendants are still binding law, and that *Johnson* only overturned other portions. *See Johnson*, 576
U.S. at 606 ("We hold that imposing an increased sentence under the residual clause of the Armed Career
Criminal Act violates the Constitution's guarantee of due process. Our contrary holdings in *James* and *Sykes*
are overruled.").

force, any flight has to reflect an intent to hit officers or be so reckless that it is endangering others. Nothing in *Sykes* supports the notion that flight alone (and the lack of concern for others it shows) is sufficient to justify deadly force, absent some ongoing risk to the safety of police officers or others. The Court must still analyze the circumstances as a whole, and while the flight is one factor which might a support a jury's finding that Fakhoury's and Becker's actions were justified, flight is not alone dispositive.

Second, Defendants note that in certain circumstances, a car should be considered a deadly weapon, and that officers may be justified in using deadly force to protect themselves against a car. *See* Mot. at 9–12. These broad statements are correct. But although a car "under certain circumstances can constitute the type of threat that justifies an officer's shooting the driver," this is not the case in all circumstances, as the Ninth Circuit has recognized.[15] *See Acosta v. City & Cnty. of San Francisco*, 83 F.3d 1143 (9th Cir. 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). On certain fact patterns, a reasonable jury can find that a moving car "was moving or rolling sufficiently slowly that a reasonable officer in [the defendant's] position would not have perceived himself to be in danger of serious bodily harm." *Id.* The Court finds that the facts here could lead a jury to a similar conclusion—that even if the car moved shortly before or even during the shooting, Fakhoury and Becker were not in danger, and thus their shooting of Ruiz was unjustified.

Third, Defendants argue that after they were justified to use deadly force, they were justified in continuing to use deadly force until the threat ended. *See* Mot. at 11 – 12. The Court need not reach this issue, given the Court's finding above that a jury could find that no amount of deadly force was ever justified. The Court does note, however, that it appears there is a genuine issue of

---

[15] The Court notes that as of the date of this Order, the state of Ninth Circuit law on this issue is even more clear. *See Orn v. City of Tacoma*, 949 F.3d 1167, 1174–75  (9th Cir. 2020) ("A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it" and there is no qualified immunity where an officer "was obviously not in harm's way" and nevertheless fired his weapon). *Orn* was decided after the incident at issue here. *See id.*

material fact as to whether, assuming the shooting was justified at all, the Deputies continued shooting beyond the point where the threat had subsided.[16]

### iii.  Defendants are not entitled to qualified immunity at this stage.

Even if an officer violates a constitutional right, the officer is entitled to qualified immunity from a Section 1983 suit if "the unlawfulness of their conduct" was not "clearly established at the time." *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021). "A law is clearly established if at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the conduct beyond debate." *Id.* (internal quotations and alterations omitted).

In determining whether police officers are entitled to qualified immunity, the Court must ask two questions: "(1) Was the law governing the officer's conduct clearly established? (2) Under that law, could a reasonable officer believe that the conduct was lawful?" *Case v. Kitsap County Sheriff's Dep't.*, 249 F. 3d 921, 926 (9th Cir. 2001). As to the first question, although a case need not be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotations omitted). Furthermore, "officials can be on notice that their conduct violates established law even in novel factual situations." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The focus on a qualified immunity analysis is "whether the officer had fair notice that her conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Qualified immunity is "an immunity from suit rather than a mere defense to liability," and so it should be decided "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). However, where there are factual disputes "surrounding the circumstances" of the

---

[16] As part of J.A.'s first cause of action, Plaintiffs allege that "Defendants are liable for Mr. Ruiz's injuries either because they were integral participants in the excessive use of force, or because they failed to intervene to prevent those violations." SAC ¶ 39 (emphasis added). Plaintiffs did not present any argument on this theory and the Court understands that the theory has been abandoned. *See* Mot. Summary judgment will be GRANTED to the Defendants that liability cannot be based on failure to intervene.

1    alleged conduct, it may not be possible to resolve qualified immunity on summary judgment. *See*

2    *Ting*, 927. F.2d at 1504.

3        Here, Defendants argue that even if their conduct is found to have violated Ruiz's rights, they

4    are entitled to qualified immunity. Defendants argue that no case law is directly on point as to the

5    constitutionality of what occurred here, and that the Supreme Court has cautioned courts about "too

6    generally evaluating qualified immunity." *See* Mot. at 23 (citing *City & Cnty. of San Francisco,*

7    *Calif. v. Sheehan*, 575 U.S. 600, 613 (2015). Defendants explain Plaintiffs bear the burden of

8    showing that a right was violated and that the right was clearly established prior to its violation. *See*

9    Mot. at 24.

10       Here, in analyzing qualified immunity on Defendants' Motion, we must construe disputed

11   facts in favor of J.A. *See Villanueva*, 986 F.3d at 1172–73. Construing all disputed facts in favor of

12   the J.A., the Buick never hit the police car and/or was not still accelerating backwards when

13   Fakhoury and Becker began shooting, contrary to the Defendants' assertion in their Motion that

14   "The undisputed facts in the case at bar, however, demonstrate Mr. Ruiz continuously reversed his

15   vehicle such that the Deputies, who, consistent with their training, remained in the protected A-

16   frame of the patrol car, lost their position, stumbling and falling backwards as a result of that force."

17   Motion at 25. It was clearly established at the time of the incident that police violate an individual's

18   constitutional rights when unwarranted deadly force is used, as discussed above. *See Garner*, 471

19   U.S. at 11; *Mattos*, 661 F.3d at 441; *Deorle*, 272 F.3d at 1281. Similarly, it was clearly established at

20   the time of the incident that police officers are not justified in shooting at a suspect fleeing in a car if

21   the car "was moving or rolling sufficiently slowly that a reasonable officer in [the defendant's]

22   position would not have perceived himself to be in danger of serious bodily harm." *Acosta*, 83 F.3d

23   at 1147. In fact, the Ninth Circuit recognized that this issue was clearly established in 1996, and held

24   that if a jury found as fact that an officer who fired at a slow moving car was not in danger, the

25   officer would not be protected by qualified immunity. *See id.* at 1147–48. Defendants argued in the

26   hearing that one case is not a "robust consensus" sufficient for qualified immunity, but the Court

27   does not read *Acosta* as one outlier case. Rather, *Acosta* acknowledges that in 1996, there was

28   already a robust consensus of cases finding that firing at a car that does not pose danger was

unconstitutional, such that qualified immunity would not apply in 1996. *See id.* Here, the Court has no choice but to find the same—if the jury were to find that Ruiz's car did not pose a danger, which is one finding that the facts could support, Fakhoury and Becker would not be protected by qualified immunity.

Accordingly, the Defendants cannot meet their burden with respect to qualified immunity because of the genuine disputes of fact that remain. As discussed above, a jury could find a set of facts that would constitute a clear constitutional violation under the standards laid out above— namely, the jury could find that when Fakhoury and Becker began shooting, there was no risk that Ruiz's car would hit them, either because he never hit the police car, had already stopped accelerating, or because they were not in the vehicle's path and protected by their parked car. Shooting under these circumstances would constitute a constitutional violation that was clearly established. There are other Ninth Circuit cases which demonstrate the limits of what constitutes an unjustified use of force against a suspect in a vehicle. For example, where a suspect accelerated towards a group of officers on foot, eventually hitting a police car, the officers did not commit a constitutional violation when they began firing at the suspect as his car came towards them. *Monzon v. City of Murrieta*, 978 F.3d 1150, 1160 (9th Cir. 2020).[17] Defendants also point to *Earl v. Campbell*, which held that "no controlling authority has placed deadly force off limits where an officer on foot perceives a car accelerating in his direction" but *Earl* is an unpublished case and "not precedent." *Earl v. Campbell*, 859 F. App'x 73, 75 (9th Cir. 2021).[18] But given the disputes of fact, these cases are of no consequence at this stage. For the reasons described above, a jury could make findings such that this case is not controlled by *Monzon*.

Finally, Defendants point to *Estate of Ford v. Ramirez-Palmer*, which held that triable issues of fact do not alone preclude a finding of qualified immunity. *See Est. of Ford v. Ramirez-Palmer*,

---

[17] The Court notes that *Monzon* was decided after the incident at issue. Nevertheless, it relied on previous Ninth Circuit caselaw, and is a useful reference point for what fact patterns might constitute a justified shooting. The Court finds it appropriate to cite it for this purpose but would not rely on it alone as clearly established law at the time of the shooting.

[18] *Earl* was also decided after the incident in question.

301 F.3d 1043, 1047 (9th Cir. 2002). But in *Ford*, the Court held that even drawing all inferences in

favor of plaintiffs, to the extent there was a constitutional violation, the law was not clearly

established prior to the incident. *See id.* Not so here. The facts are such that a reasonable juror could

find a constitutional violation that was clearly established at the time of the incident. Hence, the

triable issues of fact preclude a finding of qualified immunity here.

For these reasons, Defendants are not entitled to qualified immunity on the claim for

excessive force. Defendants' Motion is GRANTED IN PART as to the first cause of action:

Defendants cannot be liable for failing to intervene, but otherwise, this cause of action will proceed

to trial.

B.   Summary judgment is denied as to the second cause of action.

Plaintiffs' second cause of action is a Section 1983 claim for deprivation of life without due

process. *See* SAC ¶¶ 43–54. Defendants seek summary judgment on this claim. *See* Mot. at 33–35.

The Court finds that a reasonable jury could find for Plaintiffs on this claim, and so summary

judgment will be denied.

i.   *A reasonable jury could find a constitutional violation.*

Parents "have a Fourteenth Amendment liberty interest in the companionship and society of

their children," and children have a similar interest in the companionship and society of their parents

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Smith v. City of Fontana*, 818 F.2d 1411,

1418 (9th Cir. 1987), overruled on other grounds by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037

(9th Cir. 1999). Conduct that "shocks the conscience" in infringing upon these interests is actionable

as a due process violation. *Wilkinson*, 610 F.3d at 554. There are two different tests depending on the

context. *See id.* Where officials have time to deliberate, "deliberate indifference" is sufficient to

shock the conscience and trigger liability. *See id.* On the other hand, where "a law enforcement

officer makes a snap judgment" about an escalating situation, "his conduct may only be found to

shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement

objectives." *Id.* Plaintiffs appear to concede in their briefing that Fakhoury and Becker did not have

23

time to deliberate and argue only that Fakhoury and Becker acted with purpose to harm.[19] *See* Mot.
at 36.

A reasonable jury could find that Fakhoury and Becker did not face danger and acted with a
purpose to harm Ruiz. The facts discussed in the section above could support such a finding. Also
relevant is Fakhoury's statement "I'ma [sic.] shoot him," captured on the audio recording. *See* Ex.
A-1 to ECF No. 86 (Fakhoury Belt Recording) at 5:40–6:00; *see also* Ex. B-1 to ECF No. 86
(Becker Belt Recording) at 5:48–5:56. This statement came after a brief moment of commotion. *See
id.* While the tape is susceptible to multiple interpretations, one possible interpretation is that
Fakhoury decided to shoot Ruiz after any threat had ended, and as retribution for Ruiz's decision to
briefly back up towards Fakhoury and Becker or for allegedly fleeing in the first place. If shown, this
would constitute a purpose to harm unrelated to a legitimate law enforcement objective.[20] *See
Wilkinson*, 610 F.3d at 354 ("a purpose to harm might be found where an officer uses force to bully a
suspect or 'get even'"). Similarly, a jury could find that the number of shots fired, the delay in
seeking medical care, and leaving a toddler in a car for nearly ten minutes after a police shooting
was circumstantial evidence of a purpose to harm unrelated to a legitimate law enforcement
objective.[21]

   *ii.   Defendants are not entitled to qualified immunity at this stage.*

Defendants argue that qualified immunity shields them from this claim, and that even if there
was a violation, it was not of a clearly established right. This argument fails. The standard for

---

[19] At the hearing, Plaintiffs stated that they do not concede as such, and argued that the time between
Fakhoury's statement "I'ma shoot him" and the first shot (approximately two seconds) was time to deliberate.
The Court need not reach this issue, as the analysis of purpose of harm is sufficient to deny this Motion.

[20] Defendants argued in the hearing that the Court should not find a purpose to harm based solely upon the
shooting (relying on Wilkinson, 610 F.3d at 554) or on Fakhoury's statement that he was going to shoot Ruiz
in advance of shooting. The Court is not finding as such. Rather, the Court's finding is that the tone and
timing of this statement, in the broader context, are susceptible to a finding of fact by the jury that Ruiz had a
purpose to harm Ruiz.

[21] Although the Ninth Circuit held in Gonzalez v. Anaheim, 747 F.3d 789, 797 (9th Cir. 2014), , that
*speculation* as to improper motive is insufficient, the Court is aware of no authority which prohibits the jury
from finding a purpose to harm based upon *circumstantial* evidence.

qualified immunity is the same as that discussed in detail above—Plaintiffs must show that a clearly established right was violated.

The right to a protected relationship with family members is clearly established, as is the general test for evaluating such claims. *See Wilkinson*, 610 F.3d at 354. However, there does not appear to be much precedent addressing such claims in factual contexts like the one here, and neither Defendants nor Plaintiffs provided binding cases that are factually close. This lack of caselaw does not mean that the Court must grant summary judgment on qualified immunity. A "materially similar case" is not necessary when faced with "'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017); *see also Brosseau*, 543 U.S. at 199 (citing *Hope*, 536 U.S. at 738 for the proposition that where a constitutional violation "was 'obvious' that there need not be a materially similar case for the right to be clearly established"). The Court finds that interpreting the facts in the light most favorable to Plaintiffs, this is a sufficiently obvious case that qualified immunity would not apply. As discussed above, one possible interpretation of the facts is that Defendants were not in any real danger, but used deadly force, and did so with intent to harm.

For these reasons, Defendants' Motion is DENIED as to the second cause of action for deprivation of life without due process.

C. Summary judgment is denied as to the third cause of action.

Plaintiffs' third cause of action is a Section 1983 claim for interference with parent-child relationship. *See* SAC ¶¶ 55–63. Defendants move for summary judgment on this claim. *See* Mot. at 37. Both Defendants and Plaintiffs discuss this claim only briefly—simply referencing the arguments made on the previous two claims. *See* Mot. at 37–38. Because the Court found that a jury could find for Plaintiffs on the previous claims, the Court also finds that a jury could find for Plaintiffs on this claim.

For this reason, Defendants' Motion is DENIED as to the third cause of action.

D. Summary judgment is denied as to the fourth cause of action.

J.A.'s fourth cause of action is a wrongful death claim brought under to California Civil Procedure Code § 377.60 ("Section 377.60"). *See* SAC ¶¶ 64–70. Defendants move for summary judgment on this claim. *See* Mot. at 38–40.

The standard for Section 377.60 claims is similar to the *Graham* analysis for the first cause of action—the "reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Hayes v. Cnty. of San Diego*, 305 P.3d 252, 256 (Cal. 2013). In fact, "California's civil jury instructions specifically direct the jury, in determining whether police officers used unreasonable force for purposes of tort liability, to consider the same factors that the high court has identified and that the federal court's instructions in this case set forth." *Hernandez v. City of Pomona*, 207 P.3d 506, 515 (Cal. 2009). However, in evaluating negligence claims for police shootings under California law, juries may consider "tactical conduct and decisions leading up to the use of deadly force," which is a distinction from the federal law standard for evaluating Section 1983 claims. *Hayes*, 305 P.3d at 254, 262–63. Wrongful death claims may be based on allegedly negligent conduct, and Plaintiffs' SAC includes negligence as one theory supporting the wrongful death claim. *See Lattimore v. Dickey*, 239 Cal. App. 4th 959, (2015) ("The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages"); SAC ¶ 66 ("This claim is based upon the fact that Defendants' negligent, reckless and wrongful acts and omissions . . . .").

As discussed above, in applying the federal court standard, a jury could find for J.A. on the excessive force claim. For the same reasons, the jury could find for J.A. on this claim. In addition, the jury could take into account all of the pre-shooting conduct, including the initial decision to pursue Ruiz and the deputies' conduct during the pursuit. The inclusion of this conduct in the analysis might provide further factual findings supporting liability.

Defendants' Motion is DENIED as to the fourth cause of action for wrongful death.

E.   Summary judgment is denied as to the fifth cause of action.

J.A.'s fifth cause of action is for assault and battery. *See* SAC ¶¶ 71–77. Defendants move for summary judgment on this claim. *See* Mot. at 40. Defendants' sole argument as to this claim is that one essential element for a battery claim by a peace officer is the use of unreasonable force, and incorporating the arguments on other claims, Plaintiffs cannot make this showing. *See id.*

As discussed above, the Court found that J.A. could make a showing of unreasonable force. Accordingly, Defendants' Motion is DENIED as to the fifth cause of action for assault and battery.

F.   Summary judgment is denied as to the sixth cause of action.

J.A.'s sixth cause of action is action is for negligence. *See* SAC ¶¶ 78–84. Defendants move for summary judgment on this claim. *See* Mot. at 4.

Defendants argue that the standard of review for this claim "follows federal law concerning the use of force by law enforcement officers." Mot. at 41 (citing *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526–28 (2009)). Plaintiffs argue that the standard for this claim is actually distinct from the standard for Section 1983 claims, in that instead of focusing "narrowly on the moment when deadly force in used," a finder of fact analyzing a negligence claim may consider "tactical conduct and decisions leading up to the use of deadly force." *See* Mot. at 42 (citing *Hayes*, 305 P.3d at 262). As discussed above, the Court finds that on a negligence claim, it is appropriate for the jury to consider "tactical conduct and decisions leading up to the use of deadly force." *Hayes*, 305 P.3d at 254.

For the same reasons discussed on the other claims, a jury could find that Defendants actions were not "objectively reasonable based on the facts and circumstances." *See Brown*, 171 Cal. App. 4th at 527. This finding could be based on the same facts as the Section 1983 causes of action, and could be further supported by pre-shooting conduct, including the decision to pursue Ruiz and the conduct during the pursuit.

For this reason, Defendants' Motion is DENIED as to the sixth cause of action for negligence.

G.   Summary judgment is denied as to the seventh cause of action.

J.A.'s seventh cause of action is for a violation of the Bane Act. *See* SAC ¶¶ 85–92. Defendants move for summary judgment on this claim. *See* Mot. at 43–44. Defendants' sole argument is that the Bane Act requires conduct that interferes with a constitutional or statutory right, and for the reasons discussed on the other claims, Defendants did not violate any right. *See* Mot. at 44. This argument fails, for the same reasons as the similar arguments made on other claims. The Court finds that a reasonable jury could find a violation of constitutional rights by the Defendants.

Accordingly, Defendants' Motion is DENIED as to the Bane Act claim.

/ / /

/ / /

H.  Ruiz's mother Vasquez is a proper plaintiff.

Defendants argue that Ruiz is not a proper plaintiff in this action because she resides in Mexico. The Court already ruled on this issue in its order regarding Defendants' Motion to Dismiss. ECF No. 39 ("MTD Order"). The Court held that Vasquez's allegations—that she resided in the United States for 25 years, that she left shortly before the events that led to this litigation, that her children are American citizens, and that she wishes to return to the United States—were sufficient for standing. *See id.* at 7. Now, the only difference is that Vasquez's allegations are established facts. *See* PSUF ¶¶ 331–40. Defendants appear to be relitigating an already-decided issue, and the Court sees no reason to change its prior ruling. Even if the Court were to reconsider this ruling, it would not side with Defendants. As the Ninth Circuit held in *Ibrahim*, a plaintiff does not automatically forfeit the right to bring constitutional claims when he or she leaves voluntarily after establishing connections with the United States. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996 (9th Cir. 2012). Where a plaintiff "did not intend to sever her established connection to the United States by her voluntary departure," the plaintiff may still bring constitutional claims if a connection was previously established. *Id.* Here, Vasquez established a connection by living in the country for 25 years and did not intend to sever it when she left for a funeral and intended to return, as the Court previously held. *See* MTD Order at 7.

Defendants also argue that non-resident aliens may not bring "indirect" Fourth Amendment claims. *See* Mot. at 45. This issue was not directly addressed in the MTD Order. *See* MTD Order. Defendants note that non- resident aliens may bring many other Constitutional claims, including "direct claims under the Fourth Amendment," but explain that no precedent recognizes a right to bring indirect Fourth Amendment claims on behalf of others. *See id.* Defendants cite no binding precedent prohibiting such claims. *See id.* Defendants cite two non-binding cases that addressed different issues. The first held that claims cannot be brought by others on behalf of "non resident alien minors" who "lack standing to enforce constitutional rights as their own," a distinct question from the one raised here. *Estate of Garcia-Vasquez v. County of San Diego*, No. 06CV1322LABLSP, 2006 U.S. Dist. LEXIS 94341 (S.D. Cal. Dec. 27, 2006). The second held that a "longtime permanent resident" could assert a claim for the death of her daughter, despite being

outside the United States when the death occurred, but that she would need to show at trial that she was in fact a longtime permanent resident. *See Torre v. City of Salinas*, No. C0900626RMW, 2010 U.S. Dist. LEXIS 97725 (N.D. Ca. Sep. 27, 2010). Even if these were binding, neither would require the conclusion that Vasquez may not pursue her claim. Absent any authority suggesting this claim is not permitted, the Court holds that Vasquez may pursue her indirect Fourth Amendment claim.

     I.   Summary judgment is denied on the issue of punitive damages.

     Plaintiffs seek punitive damages. *See* SAC at Prayer for Relief. Defendants move for summary judgment on this issue, arguing punitive damages are not warranted.

     A jury in a Section 1983 case may assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Here, the Court finds that a reasonable juror could make such a finding. The facts that might support such a finding are similar to those that could support a finding that Fakhoury and Becker acted with a purpose to harm Ruiz, discussed in detail above. Defendants have not carried their burden of showing that they are entitled to summary judgment on this issue. Summary judgment is DENIED as to the question of punitive damages.

**VI.**   **Conclusion**

     For the reasons stated herein, Defendants' Motion is GRANTED IN PART:

1.  Plaintiff's first cause of action cannot proceed on a theory of failure to intervene. Summary judgment is otherwise DENIED as to the first cause of action.

2.  Summary judgment is DENIED as to the second, third, fourth, fifth, sixth, and seventh causes of action.

3.  Summary judgment is DENIED on the issue of punitive damages.

     IT IS SO ORDERED.

Dated: November 9, 2023

                           MAAME EWUSI-MENSAH FRIMPONG

                              United States District Judge